UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DEBORAH L. SNYDER,

                                        Plaintiff,

           v.                                                    1:05-CV-1513
                                                                 (GJD)
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

PETER M. MARGOLIS, ESQ., Attorney for Plaintiff
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, Magistrate Judge

## MEMORANDUM DECISION AND ORDER

This matter has been referred to me for all further proceedings, including the entry of judgment pursuant to 28 U.S.C. § 636(c), the consent of the parties, and the order of the Honorable Gary L. Sharpe dated February 2, 2007. (Dkt. No. 11).

## PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and Supplemental Security Income ("SSI") benefits on January 29, 2003. (Administrative Transcript ("T.") 53-55).  The applications were denied initially, and a request was made for a hearing. (T. 29, 34-37, 39).  A hearing was held before an Administrative Law Judge ("ALJ") on June 15, 2004.  (T. 176-206).  In a decision dated December 16, 2004, the ALJ found that plaintiff was not disabled.  (T. 18-27).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on October 4, 2005.  (T. 4-6).

## CONTENTIONS

Plaintiff's brief is extremely unclear regarding the possible issues that are being raised.[1]  The brief contains one paragraph entitled "Issues," in which counsel argues that plaintiff's impairments meet or equal the severity of a listed impairment. (Brief at p.1).  The brief then contains a series of disjointed arguments that appear to claim that certain things "need to be clarified." (Brief at p.4, ¶¶ 11, 12).  Finally, counsel has submitted additional records and argues that this case should be remanded for the consideration of new and material evidence. Plaintiff's Ex. 1.

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.  In contrast to plaintiff's brief, the Commissioner's brief is thorough, well-written, and fully complies with General Order 18.

## FACTS

### A.  Non-Medical Evidence and Testimony

Plaintiff was forty eight years old at the time of the ALJ's hearing and previously worked as a waitress, an operator of construction machinery, and a laborer packing books. (T. 66, 95).  Plaintiff worked from the 1980's to 1997 (T. 95), when she had an accident at work that caused her to stop working. (T. 186).  Plaintiff testified that while she was working at a company packing books, a rack of books

---

[1] Plaintiff's brief does not comply with General Order 18 of the Northern District of New York.  It does not contain a Statement of Facts from the Administrative Transcript.  It simply contains a recitation of the findings of the ALJ which are clearly stated in the ALJ's decision.  In addition, plaintiff's brief does not contain arguments which are supported by references to the record.  General Order 18 clearly requires references to the pages in the Transcript that support plaintiff's arguments.  Counsel is advised that future submissions of this type may result in the brief being stricken from the docket.

weighing six to eight hundred pounds fell on her causing her to fall on a concrete floor. (T. 186). After that accident, she stated that she could not work anymore because of numbness [in her legs], and she terminated her employment. (T. 186).

At the very beginning of the hearing, the ALJ asked plaintiff whether she was aware that she could have a representative assist her during the hearing. (T. 179). Plaintiff responded "no." (T. 179). The ALJ proceeded with the hearing, advising plaintiff that if she needed help, he would stop and give her the opportunity to find a representative to assist her. (T. 180).

At the June 15, 2004 hearing, plaintiff testified that she has numerous problems with her back, legs, and hands. (T. 193, 199). She stated that her legs give out, and she falls down "a lot." (T. 193). Plaintiff brought her friend Jennifer Gough to the hearing. (T. 194). Ms. Gough testified and confirmed that plaintiff had fallen down "a couple [of] times, and injured herself from the fall." (T. 194). Plaintiff also stated that she experiences swelling in her legs if she stands for long periods of time, and that her legs are painful and numb. (T. 191). Ms. Gough confirmed that plaintiff's legs become swollen and that the swelling takes one day to subside. (T. 194).

The ALJ asked plaintiff whether she had any hobbies that she was still able to do, and plaintiff stated that she "started a craft two years ago." (T. 198). When the ALJ asked plaintiff why she had not finished the project, Ms. Gough answered that plaintiff could not grasp things with her right hand, and sometimes dropped objects. (T. 198). In addition, Ms. Gough testified that plaintiff's hand was unsteady and Ms. Gough completes paperwork for the plaintiff "because she can't do it." (T. 199). Plaintiff stated that she would start writing "for maybe a minute," and then the writing would become "like chicken scratch." (T. 199).

3

Plaintiff stated that she was using three medications: Neurontin, Baclofen, and Effexor. (T. 197). Plaintiff stated that she was very depressed over her inability to work, and that the Effexor is an anti-depressant. (T. 197). When questioned about her prior neck surgery in 1994, plaintiff stated that she was going to have additional surgery performed by Dr. Di Risio, and that the new surgery will be "more complicated." (T. 188). Plaintiff stated that she had an appointment with Dr. Di Risio for June 28, 2004, and after learning about the forthcoming appointment, the ALJ stated several times that he wanted to see Dr. Di Risio's report after the June 28, 2004 visit. (T. 200, 202, 203, 205).

The ALJ commented that the reports in the record about plaintiff's back "sound[ed] pretty bad" and specifically noticed on the record that plaintiff had a difficult time walking into the hearing room. (T. 200). The ALJ then restated his desire to see Dr. Risio's report after the June 28th visit since the ALJ was having difficulty reconciling statements about plaintiff's current medical condition with a report from an independent examining physician, Dr. Murthy, dated March 11, 2003. (T. 164, 167).

The ALJ offered to keep the hearing open so that he could receive a copy of Dr. Di Risio's report of June 28, 2004. The report appears in the record at page 175, and states that MRI and regular X-rays show that plaintiff has severe spondylosis, and that plaintiff's condition has deteriorated during the last year. (T. 175).

## B. Medical Evidence

During February of 1994, Dr. Horowitz, a neurosurgeon and professor at Albany Medical Center, diagnosed plaintiff with a herniated disc which was confirmed by an MRI showing a very severe disc herniation, with osteophyte

formation at C5-6, "compressing the spinal cord." (T. 134). Dr. Horowitz noted that the diameter of the spinal canal was usually 10 or 11 millimeters, but that the diameter of plaintiff's spinal canal was only 5 millimeters. *Id.* Dr. Horowitz stated that this "explains all of her symptomatology." (T. 134). Dr. Horowitz stated that the only treatment for this was surgery and recommended that plaintiff undergo surgery as soon as possible. (T. 134).

Dr. Horowitz referred plaintiff to Dr. Arthur Schilp, a neurosurgeon who was also a professor at the Albany Medical College in Albany, New York. (T. 115). On March 16, 1994,[2] plaintiff was admitted to the Albany Medical Center for her surgery. (T. 115). Plaintiff had been experiencing right sided numbness and right hand weakness since December of 1993. (T. 115). Dr. Schilp performed an anterior cervical discectomy with fusion. (T. 117). Dr. Schilp's report of April 11, 1994 shows that plaintiff improved significantly after the surgery, and many of plaintiff's problems about loss of sensation were improving, but plaintiff still had some spasticity in her lower extremity, in addition to "nonsustained clonus."[3]

According to plaintiff, she recovered and returned to work in a factory that produced building blocks. (T. 185). She continued to work until 1995 when that factory closed. (T. 185). She then began work at the book company where she experienced the accident in 1997, causing her to stop working. (T. 185, 85).

During early 1998, plaintiff began seeking treatment for problems with her neck and other parts of her spine. An MRI dated January 25, 1998 showed a disc bulge and

---

[2] Plaintiff was discharged from the hospital on March 21, 2004. (T. 115).

[3] Clonus is the rhythmic rapid alternation of muscle contraction and relaxation. DORLAND'S MEDICAL DICTIONARY 153 (Shorter Ed.1980).

herniation at the thoracic levels of plaintiff's spine, and stenosis in plaintiff's cervical spine. (T. 145). Plaintiff was examined by Dr. Bernice Burkarth, a neurosurgeon at Albany Medical Center. (T. 147-48). In a report dated April 16, 1998, Dr. Burkarth concluded that there appeared to be a new disc herniation at plaintiff's C6-C7 area, and ordered more testing to determine a course of action. (T. 148). Dr. Bruce Tranmer, another neurosurgeon and associate professor at Albany Medical College, also examined plaintiff and found weakness in plaintiff's hands and spastic[ity] in plaintiff's arms and legs. (T. 148).

On July 29, 1998, plaintiff was examined by Dr. Balagtas, who performed a consultative orthopedic examination. (T. 151-52). Dr. Balagtas made detailed findings about plaintiff's cervical spine, upper extremities, spine, and lower extremities. She found that plaintiff's cervical spine was slightly limited in extension and lateral rotation, but normal in flexion. (T. 151). Dr. Balagtas found normal range of motion in plaintiff's shoulders, no muscle atrophy, and normal flexion extension and lateral rotation, and flexion of plaintiff's lumbar spine. (T. 152). She also found full range of motion in plaintiff's hips, knees, and ankles. Dr. Balagtas's prognosis was fair, and her impression was that plaintiff had pain in her upper back. (T. 152). Dr. Balagtas stated that plaintiff would have some limitations in overhead hand activities as well as lifting. (T. 152).

Approximately one week later, on October 6, 1998, non-examining physician, Dr. Donna White prepared a Residual Functional Capacity (RFC) Assessment based on her review of the record. (T. 154-61). Dr. White found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, could stand and sit for approximately six hours each day, and did not have limitations with respect to pushing

or pulling.

The record does not contain evidence of medical treatment between August 1998 and early 2003. There are three office notes on page 163. One note is dated August 22, 1998, signed by Dr. Leonard Sonne, and is unrelated to plaintiff's back problems. (T. 163). The other two notes are signed by Registered Physician's Assistant, J. Kreitner. (T. 163). One note appears to be dated January 17, 2003, and the second note is dated January 31, 2003. On January 17, 2003, P.A. Kreitner stated that plaintiff was suffering from numbness and pain in both arms and in both legs. (T. 163). P.A. Kreitner stated that plaintiff had a "significant history" of neurologic dysfunction as the result of "spinal issues," and that plaintiff had an MRI from 1998, and was being "followed" by the Albany Medical Center, but then did not "follow up." (T. 163). P.A. Kreitner believed that plaintiff should be referred back to Albany Medical Center for a neurology consultation and started plaintiff on Relafen. (T. 163).

On September 24, 2003, plaintiff was examined by Dr. Alan Boulos, a neurosurgeon from the Albany Medical Center. (T. 170). He noted that plaintiff was "last seen" by Dr. Tramner in April of 1998. (T. 170). Dr. Boulos examined plaintiff and believed that plaintiff's symptomatology was likely related to a spinal cord injury near the site of her previous operation. (T. 170). Dr. Boulos prescribed the medication Neurontin, and asked plaintiff to return if the Neurontin did not improve her symptoms. Dr. Boulos noted that if plaintiff did not improve with medication, the doctor would propose another surgical procedure, although he questioned whether even that would improve her symptoms. (T. 170).

On November 26, 2003, plaintiff was again examined by Dr. Boulos. (T. 168-70). Dr. Boulos examined an MRI performed during April of 2003 which showed

7

multiple levels of disc herniation at C4-5, C5-6, and C6-7. (T. 169).  Dr. Boulos noted that plaintiff's examination showed weakness of the hand intrinsics, hand extensors, triceps, biceps, and deltoid muscles. (T. 169).  Dr. Boulos concluded that plaintiff should undergo repeat discectomies above and below the C5-6 level which was operated on during 1994.  He explained the risks of surgery to plaintiff, but told her that "any hope of neurological recovery would probably rest on this operation." (T. 169).  He referred plaintiff to Dr. DiRisio, who had special experience in that type of surgery.

Dr. Darryl DiRisio examined plaintiff on January 19, 2004. (T. 168).  Dr. DiRisio stated that plaintiff had "severe weakness" in her right arm that had been progressing over the past several months. (T. 168).  Plaintiff had sustained clonus on the right upper and lower extremities, wrist drop, and weakness in the triceps. (T. 168).  Dr. DiRisio agreed with Dr. Boulos's findings of problems at three different levels in plaintiff's cervical spine.  He concluded that plaintiff has "multilevel cervical spondylosis."  Dr. DiRisio advised plaintiff about her options and the risks of this new surgery, and plaintiff stated that she wanted to proceed with the surgery. (T. 168).

The last medical report in the record is from Dr. DiRisio and is dated June 28, 2004.  Dr. DiRisio stated that plaintiff "in the last year . . . has slowly, steadily deteriorated." (T. 175).  Dr. DiRisio stated that both an MRI and plain X-rays showed spondylosis and narrowing of plaintiff's spinal canal.  Dr. Di Risio planned surgical intervention consisting of anterior spinal decompression and fusion. (T. 175).  Plaintiff was in agreement with this course of action. (T. 175).

With his brief in this case, plaintiff's counsel has submitted what he argues constitutes "new evidence."  Plaintiff's Ex. 1.  This evidence consists of a letter dated

September 26, 2005, from Karen Petronis, a Nurse Practitioner (NP) in Dr. DiRisio's office. Her letter states that plaintiff had the additional surgery "approximately 6 months ago."

Plaintiff's physical examination showed that her upper extremity strength was "very weak in the right deltoid region," although NP Petronis stated that she believed that plaintiff's strength had increased since her previous examination. The letter also states that plaintiff was doing well in the postoperative course, but that she has myelopathic changes that affect her gait. NP Petronis stated that she recommended that plaintiff use a "quad cane" because she had "recent falls."

Plaintiff's counsel has also submitted two office notes from a Physician's Assistant, Sharon Aragona, dated August 18, 2005 and September 21, 2005. Plaintiff's Ex. 2. These office notes discuss plaintiff's depression and her prescription for Lexapro. The office notes also mention plaintiff's "history of alcohol abuse." On September 21, 2005, PA. Aragona gave plaintiff the name of a local psychologist for therapy. Finally, plaintiff's counsel has submitted a "Function Report-Adult" completed by plaintiff that appears to be dated March 28, 2005.

## DISCUSSION

### 1. <u>Disability Standard</u>

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

10

**2.**   **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).   A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the

evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

3.     **Listed Impairment**

Plaintiff's counsel states that plaintiff's impairment meets or equals the severity of a listed impairment.  As the defendant points out in his[4] brief, plaintiff's counsel never mentions to what listed impairment he refers.  The ALJ found that plaintiff's impairment did not meet the Listing 1.04 that governs disorders of the spine. (T. 24). *See* 20 C.F.R. Part 404, Subpt. P. § 1.04.  The ALJ found that there was no evidence of "any nerve root compression", plaintiff's straight leg raising was "negative bilaterally", and that plaintiff could "ambulate effectively." (T. 24).  The ALJ then stated that the "state agency physician who reviewed the claim did not find that the claimant's impairment met or equaled any of the Listings." (T. 24).

The court would first point out that the "state agency physician" to which the ALJ refers did ***not*** specifically consider the Listings. (T. 154-61).  This report appears to be only an RFC evaluation based on a review of plaintiff's records and is dated in 1998.  However, plaintiff's attorney does not cite to any reports or evidence that

---

[4] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security.

would support a finding that plaintiff's impairment meets or equals the severity of this Listing 1.04.  Because this court finds that the ALJ improperly relied upon this RFC evaluation in making his determination that plaintiff could perform sedentary work and the court is remanding this action for further evaluation and further information from the treating physicians, the issue of whether plaintiff has a listed impairment should also be reconsidered.

**4.    Residual Functional Capacity and Duty to Develop the Record**

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and ***may not simply make conclusory statements regarding a plaintiff's capacities***. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In making his determination, the ALJ has an affirmative duty to develop the record. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).  The ALJ has this duty at all times, but is heightened when a claimant is proceeding pro se. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).  This is particularly so when the records in question are from a treating physician. *Jones v. Apfel*, 66 F. Supp. 2d 518, 538 (S.D.N.Y. 1999).

While a treating physician's opinion is not binding on the Commissioner, the

opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In this case, the ALJ found that plaintiff had the RFC to perform a "full range" of sedentary work, and used the Medical Vocational Guidelines (the Grid) to find that plaintiff could perform other work in the national economy. (T.25).  It is unclear how the ALJ came to this conclusion.  He appears to have utilized the ***1998*** RFC evaluation by Dr. White (a non-examining physician) that found plaintiff could perform "light work" and then the ALJ states that he is giving plaintiff "the benefit of the doubt" in finding that she can perform sedentary work. (T. 25).

The court would first point out that the 1998 assessment by Dr. White is well-before the deterioration of plaintiff's condition in 2003 and does not adequately reflect the later opinions of plaintiff's treating physicians, none of which have actually been asked what functions plaintiff can perform.  The ALJ makes a huge jump from Dr. White's opinion to the assumption that plaintiff could perform sedentary work without assessing plaintiff's actual functional limitations.  It is clear from the record that plaintiff has trouble with her hands, and there is no indication that the ALJ ever

considered whether the "full range" of sedentary work might be limited by plaintiff's specific medical problems.[5]

The ALJ's decision in this case (T. 21-27) ***does not*** discuss plaintiff's treatment by the neurosurgeons and professors at the Albany Medical College.  Plaintiff has been treated extensively by Dr. Boulos, Dr. DiRisio, and other neurosurgeons and professors of surgery at the Albany Medical College. (T. 168-170, 175).

Although the ALJ mentioned three or four times during the hearing that he was very interested in seeing Dr. DiRisio's report of the June 28th visit (T. 200, 202, 203, 205), the ALJ ***did not*** comment on the content of Dr. Di Risio's June 28th report which ***clearly shows*** that plaintiff had severe spondylosis and narrowing from C4-5 all the way to C6-7 and that Dr. DiRisio was recommending surgery. (T. 175).  Dr. DiRisio also stated that plaintiff was having a lot of difficulty with her gait and "significant difficulties with the use of her hands." (T. 175).  The ALJ noticed the trouble that plaintiff was having with her gait at the hearing. (T. 201-202).

The ALJ also noted at the hearing that the 1998 consultative opinion was "pretty old," but even the 2003 consultative opinion "didn't find too much." (T. 202).  Then the ALJ stated that "I've got to reconcile those two pictures, and maybe Dr. Dirrizio [sic] will help us with that." (T. 202).  The ALJ never followed up on this statement, and certainly never obtained information from Dr. DiRisio that would

---

[5] If an plaintiff's full-range of any exertional category of work is "significantly" limited by non-exertional or other limitations, the ALJ may not be able to use the Grid exclusively and may need to seek the assistance of a vocational expert to determine whether a plaintiff can perform substantial gainful work in the national economy. *See Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).

"reconcile" the opinions.  Because plaintiff was pro se, there was a duty to obtain this information, particularly since the ALJ recognized that there was a conflict that he was clearly unable to resolve.

This absence of any analysis of the reports of these very important treating specialists and the failure to include this medical treatment in the ALJ's decision results in an incomplete decision and a failure to develop the record.  The ALJ's decision about plaintiff's medical condition and her RFC is not supported by substantial evidence in the record since this important part of plaintiff's medical history is totally missing from the ALJ's decision.

The only reference to Dr. DiRisio in the ALJ's decision is a short paragraph which simply states that the Social Security Administration contacted Dr. DiRisio's office and learned that the plaintiff was scheduled twice for surgery, but did not "follow through." (T. 114).  The ALJ appears to fault plaintiff for this problem, however, it is unclear what the reasons were for the delay in the surgery, and clearly the ALJ never attempted to obtain an opinion from Dr. DiRisio about the inconsistencies between his reports and the reports of the 2003 consultative physician.

While it is certainly unclear what plaintiff's medical condition was between 1998 and early 2003, it is very clear that beginning in 2003,[6] plaintiff sought and received treatment from neurosurgeons at Albany Medical Center.  While plaintiff's condition may have improved between 1998 and February 2003, it is clear that as Dr.

---

[6]The court is aware that plaintiff's insured status for standard disability benefits expired in September of 2002, however, this case includes applications for both disability insurance benefits and SSI benefits.  SSI benefits do not have an insured requirement.

DiRisio stated on June 28, 2004, that plaintiff's condition deteriorated during the "last" year. (T. 175).  The ALJ failed to include or analyze this important medical evidence, and did not properly develop the record for this pro se plaintiff.  For this reason, this case must be remanded to the Commissioner for a complete analysis of plaintiff's medical condition.

## 5.  <u>Credibility</u>

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity

to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ makes a cryptic reference to plaintiff's credibility. (T. 24-25). He states that plaintiff reported having pain all the time, and that damp weather made her worse. (T. 24). The ALJ then stated that plaintiff took Tylenol for pain which gave her some relief. (T. 25). The ALJ concluded that the plaintiff's allegations of pain were only "credible to the extent that she is limited to sedentary work but do not preclude all work." (T. 25).

It is unclear to what the ALJ is referring, however, the court notes that none of the treating neurologist questioned plaintiff's pain. None of the neurologists questioned the fact that plaintiff had weakness in her hands. *See e.g.* (T. 168-69). The neurologists continue to state that plaintiff's symptoms are consistent with the clinical findings. (T. 168, 170). However, since the ALJ never mentioned any of these

18

treating physician records, it is unclear how the ALJ made any kind of credibility assessment.  Thus, on remand, the ALJ should properly assess plaintiff's credibility.

**6.**   **New and Material Evidence**

As stated above, this court is remanding for a further evaluation of many aspects of the Commissioner's decision.  The court must briefly comment on the "new and material" evidence that plaintiff's counsel has submitted.  Under sentence six of 42 U.S.C. § 405(g), when a plaintiff presents "new and material" evidence to a district court that has never been presented to the Commissioner, the court may only remand for the Commissioner to consider the new and material evidence if there is "good cause" for the failure to incorporate the evidence into the record in a prior proceeding.

The Second Circuit has developed a three-part showing that is required to support a sentence six remand for "new and material evidence" pursuant to section 405(g). *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).  First, the evidence must be "new" and not merely cumulative of what is already in the record. *Id.* (citing *Szubak v. Secretary of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984)).

Second, in order for the new evidence to be "material," it must be ***both relevant to the claimant's condition during the time period for which benefits were denied and probative.*** *Id.* (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975)). The Second Circuit has also held that the concept of "materiality" requires a finding that there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the claimant's application differently. *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991).  Finally, the plaintiff must show that there is good

19

cause for failing to present the evidence earlier. *Lisa v. Secretary of the Dep't of Health & Human Services*, 940 F.2d 40, 43 (2d Cir. 1991)(quoting *Tirado*, 842 F.2d at 597).

In this case, only one of the documents submitted may qualify as "new and material" evidence.  The letter written NP Karen Petronis on September 26, 2005 is certainly new because it was written after the Commissioner's decision, and it is "material" only in the sense that it shows that plaintiff did undergo surgery in 2005. Plaintiff's Ex. 1.  Since the ALJ appears to have faulted plaintiff for failing to "follow through" with the surgery, this letter shows that the ALJ was incorrect in his findings, so there is a reasonable probability that it would have changed the ALJ's decision. Thus, on remand, the Commissioner may consider this evidence to the extent that it relates to plaintiff's condition at the time of the current application in addition to any additional information it obtains from plaintiff's treating physicians in the sentence four remand.

The other evidence submitted by plaintiff's counsel does not meet the standard for new and material evidence.  The office notes from RPA Aragona relate to a condition that was not present or considered in the current application.  The "Function Report-Adult" appears to have been submitted in conjunction with a more recent application for benefits.  Clearly, this document is not new and material evidence relating to the application in this case.  As stated by defendant, any new application is not before this court.

The court must also note that it is concerned with the length of time that cases

take after remand.  The Second Circuit has stated that time limits on remand are appropriate in cases of "unreasonable delay." *Butts v. Barnhart*, 416 F.3d 101, 105 (2d Cir. 2005)(citation omitted).  Although the court is not prepared to state that the delay in this case is "unreasonable" at this time, defendant should attempt to complete proceedings on remand in a "reasonable" amount of time, which this court believes to be approximately 120 days.

**WHEREFORE,** based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **REVERSED**, and this case is **REMANDED** pursuant to **SENTENCE FOUR** of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Dated: March 12, 2007

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge